IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

PAMDORA Z[1].,                                   No. 6:18-cv-01215-HZ

            Plaintiff,

    v.

COMMISSIONER, Social Security                    OPINION & ORDER
Administration,

            Defendant.


Katherine L. Eitenmiller
Mark A. Manning
HARDER, WELLS, BARON & MANNING, P.C.
474 Willamette Street
Eugene, Oregon 97401

      Attorneys for Plaintiff

---

[1] In the interest of privacy, this Opinion uses only the first name and the initial of the last name of the non-governmental party or parties in this case. Where applicable, this Opinion uses the same designation for a non-governmental party's immediate family member.

Billy J. Williams
UNITED STATES ATTORNEY
District of Oregon
Renata Gowie
ASSISTANT UNITED STATES ATTORNEY
1000 S.W. Third Avenue, Suite 600
Portland, Oregon 97204-2936

Justin L. Martin
SPECIAL ASSISTANT UNITED STATES ATTORNEY
Office of the General Counsel
Social Security Administration
701 Fifth Avenue, Suite 2900 M/S 221A
Seattle, Washington 98104-7075

       Attorneys for Defendant

HERNANDEZ, District Judge:

Plaintiff Pamdora Z. brings this action seeking judicial review of the Commissioner's

final decision to deny disability insurance benefits (DIB) and disabled widow's benefits (DWB).

This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  I affirm the Commissioner's

decision.

PROCEDURAL BACKGROUND

Plaintiff applied for DIB and DWB on October 21, 2014, alleging an onset date of

January 31, 2007.  Tr. 195-98.  Her applications were denied initially and on reconsideration.  Tr.

63-75, 88-100, 116-200 (DIB, Initial); Tr. 62, 76-87, 101-13, 121-25 (DWB, Initial); Tr. 114,

128-30 (DIB, Recon.); Tr. 115, 131-33 (DWB, Recon.).  On February 27, 2017, Plaintiff

appeared, with counsel, for a hearing before an Administrative Law Judge (ALJ).  Tr. 45-61.  On

June 26, 2017, the ALJ found Plaintiff not disabled.  Tr. 15-38.  The Appeals Council denied

review.  Tr. 1-5.

## FACTUAL BACKGROUND

Plaintiff alleges disability based on (1) muscle spasms; (2) chronic back, neck, and leg pain; (3) numbness, burning, and tingling in lower extremities; (4) numbness and tingling in hands and arms; (5) bad left eye; (6) anxiety; (7) depression; (8) "extreme certain bodily functions"; (9) chemicals reaction; and (10) type 2 diabetes. Tr. 210, 225. At the time of the hearing, she was fifty-five years old. Tr.195 (showing date of birth). She completed high school, Tr. 50, and has past relevant work experience as a grocery clerk and small products assembler. Tr. 29.

## SEQUENTIAL DISABILITY EVALUATION

A claimant is disabled if he or she is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than 12 months[.]" 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).

Disability claims are evaluated according to a five-step procedure. *See Valentine v. Comm'r*, 574 F.3d 685, 689 (9th Cir. 2009) (in social security cases, agency uses five-step procedure to determine disability). The claimant bears the ultimate burden of proving disability. *Id.*

In the first step, the Commissioner determines whether a claimant is engaged in "substantial gainful activity." If so, the claimant is not disabled. *Bowen v. Yuckert*, 482 U.S. 137, 140 (1987); 20 C.F.R. §§ 404.1520(b), 416.920(b). In step two, the Commissioner determines whether the claimant has a "medically severe impairment or combination of impairments." *Yuckert*, 482 U.S. at 140-41; 20 C.F.R. §§ 404.1520(c), 416.920(c). If not, the

3 - OPINION & ORDER

claimant is not disabled.

In step three, the Commissioner determines whether plaintiff's impairments, singly or in combination, meet or equal "one of a number of listed impairments that the [Commissioner] acknowledges are so severe as to preclude substantial gainful activity." *Yuckert*, 482 U.S. at 141; 20 C.F.R. §§ 404.1520(d), 416.920(d). If so, the claimant is conclusively presumed disabled; if not, the Commissioner proceeds to step four. *Yucker*t, 482 U.S. at 141.

In step four, the Commissioner determines whether the claimant, despite any impairment(s), has the residual functional capacity (RFC) to perform "past relevant work." 20 C.F.R. §§ 404.1520(e), 416.920(e). If the claimant can perform past relevant work, the claimant is not disabled. If the claimant cannot perform past relevant work, the burden shifts to the Commissioner. In step five, the Commissioner must establish that the claimant can perform other work. *Yuckert*, 482 U.S. at 141-42; 20 C.F.R. §§ 404.1520(e) & (f), 416.920(e) & (f). If the Commissioner meets his burden and proves that the claimant is able to perform other work which exists in the national economy, the claimant is not disabled. 20 C.F.R. §§ 404.1566, 416.966.

THE ALJ'S DECISION

At step one, the ALJ determined that Plaintiff had not engaged in substantial gainful activity since her alleged onset date through her date of last insured. Tr. 21. She also determined that Plaintiff met the insured status of the Social Security Act through December 31, 2010, and further, that for the DWB claim, the relevant "prescribed period" ended on April 30, 2014. Tr. 20-21. At step two, the ALJ determined that Plaintiff has severe impairments of cervical and lumbar degenerative disc disease, status post lumbar discectomy; diabetes mellitus; anxiety

disorder; and mild left fourth nerve palsy.  Tr. 21.  However, at step three, the ALJ found that these impairments did not meet or equal, either singly or in combination, a listed impairment. Tr.21-23.

At step four, the ALJ concluded that Plaintiff has the RFC to perform light work with the following additional restrictions: (1) occasional climbing of ramps and stairs; (2) never climbing of ladders, ropes, or scaffolds; (3) occasional stooping; (4) frequent kneeling, crouching, and crawling; and (5) avoiding even moderate exposure hazards.  Tr. 23.  Additionally, she is able to understand, remember, and carry out simple, routine, repetitive tasks.  *Id.*  With this RFC, the ALJ determined that Plaintiff is able to perform her past relevant work as a small products assembler.  Tr. 29-30.  Alternatively, at step five, the ALJ determined that Plaintiff is able to perform jobs that exist in significant numbers in the economy such as garment sorter, routing clerk, bottling-line attendant, parking lot attendant, and laundry folder.  Tr. 30-31.  Thus, the ALJ determined that Plaintiff is not disabled.  Tr. 31-32.

## STANDARD OF REVIEW

A court may set aside the Commissioner's denial of benefits only when the Commissioner's findings "are based on legal error or are not supported by substantial evidence in the record as a whole."  *Vasquez v. Astrue*, 572 F.3d 586, 591 (9th Cir. 2009) (internal quotation marks omitted).  "Substantial evidence means more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Id.* (internal quotation marks omitted).  The court considers the record as a whole, including both the evidence that supports and detracts from the Commissioner's decision.  *Id.*; *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035 (9th Cir. 2007).  "Where the evidence

is susceptible to more than one rational interpretation, the ALJ's decision must be affirmed." *Vasquez*, 572 F.3d at 591 (internal quotation marks and brackets omitted); *see also Massachi v. Astrue*, 486 F.3d 1149, 1152 (9th Cir. 2007) ("Where the evidence as a whole can support either a grant or a denial, [the court] may not substitute [its] judgment for the ALJ's") (internal quotation marks omitted).

## DISCUSSION

Plaintiff argues that the ALJ erred by improperly finding her subjective symptom testimony not fully credible and improperly rejecting a treating physician opinion.

## I. Credibility

The ALJ is responsible for determining credibility. *See Vasquez*, 572 F.3d at 591. Once a claimant shows an underlying impairment and a causal relationship between the impairment and some level of symptoms, clear and convincing reasons are needed to reject a claimant's testimony if there is no evidence of malingering. *Carmickle v. Comm'r*, 533 F.3d 1155, 1160 (9th Cir. 2008) (absent affirmative evidence that the plaintiff is malingering, "where the record includes objective medical evidence establishing that the claimant suffers from an impairment that could reasonably produce the symptoms of which he complains, an adverse credibility finding must be based on 'clear and convincing reasons'"); *see also Molina v. Astrue*, 674 F.3d 1104, 1112 (9th Cir. 2012) (ALJ engages in two-step analysis to determine credibility: First, the ALJ determines whether there is "objective medical evidence of an underlying impairment which could reasonably be expected to produce the pain or other symptoms alleged"; and second, if the claimant has presented such evidence, and there is no evidence of malingering, then the ALJ must give "specific, clear and convincing reasons in order to reject the claimant's testimony about

the severity of the symptoms.") (internal quotation marks omitted).

When determining the credibility of a plaintiff's complaints of pain or other limitations, the ALJ may properly consider several factors, including the plaintiff's daily activities, inconsistencies in testimony, effectiveness or adverse side effects of any pain medication, and relevant character evidence. *Orteza v. Shalala*, 50 F.3d 748, 750 (9th Cir. 1995). The ALJ may also consider the ability to perform household chores, the lack of any side effects from prescribed medications, and the unexplained absence of treatment for excessive pain. *Id.*; *see also Tommasetti v. Astrue*, 533 F.3d 1035, 1039 (9th Cir. 2008) ("The ALJ may consider many factors in weighing a claimant's credibility, including (1) ordinary techniques of credibility evaluation, such as the claimant's reputation for lying, prior inconsistent statements concerning the symptoms, and other testimony by the claimant that appears less than candid; (2) unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment; and (3) the claimant's daily activities.") (internal quotation marks omitted).

As the Ninth Circuit explained in *Molina*:

> In evaluating the claimant's testimony, the ALJ may use ordinary techniques of credibility evaluation. For instance, the ALJ may consider inconsistencies either in the claimant's testimony or between the testimony and the claimant's conduct, unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment, and whether the claimant engages in daily activities inconsistent with the alleged symptoms[.] While a claimant need not vegetate in a dark room in order to be eligible for benefits, the ALJ may discredit a claimant's testimony when the claimant reports participation in everyday activities indicating capacities that are transferable to a work setting[.] Even where those activities suggest some difficulty functioning, they may be grounds for discrediting the claimant's testimony to the extent that they contradict claims of a totally debilitating impairment.

*Molina*, 674 F.3d at 1112-13 (citations and internal quotation marks omitted).

The ALJ properly relied on the two-step analysis. Tr. 23-24. The ALJ found that Plaintiff's medically determinable impairments could cause some of her alleged symptoms. Tr. 24. However, she concluded that Plaintiff's statements concerning the intensity, persistence, and limiting effects of her symptoms were not entirely consistent with the medical evidence and other evidence in the record. Tr. 24-25. In support of this determination, the ALJ found that Plaintiff's subjective testimony was inconsistent with her activities of daily living, was not supported by the medical evidence, and was undermined by what the ALJ found to be fairly conservative treatment during the relevant time period. Tr. 24-27. The ALJ also found that Plaintiff's pain was fairly well controlled with medication and that she stopped working for reasons unrelated to her disabling symptoms. *Id.*

Plaintiff argues that the ALJ erred because the medical records support Plaintiff's complaints and her activities of daily living do not undermine her allegations. She also contends that the ALJ suggested there was a gap in the medical record around the time of Plaintiff's alleged onset date and as a result, the ALJ should have taken medical expert testimony to determine the onset date. Plaintiff further asserts that her treatment modalities were not conservative and that she needed more than "low-dose" medications to alleviate her symptoms.

A. Daily Living Activities

The ALJ stated that the record showed that Plaintiff adequately maintained her personal care, prepared simple meals, performed household chores and laundry, engaged in yard work, mowed the lawn, walked, drove, attended to shopping, managed her finances, lifted items, and cared for her pets. Tr. 27. She also watched television, used a computer, and socialized with friends. *Id.* The ALJ observed that she went rafting and fishing in May 2014 for three and one-

half hours.  Tr. 26; *see also* Tr. 27.

        Plaintiff argues that the ALJ's reliance on the rafting excursion is not a clear and convincing reason to reject her testimony because it was a "one-off" activity, the record contains no specific details regarding the event, and at the time, Plaintiff had undergone lumbar spine surgery and was told that she needed surgery on her cervical spine.  Pl.'s Op. Br. 17, ECF 10. The record shows that on May 5, 2014, Plaintiff reported to her physical therapist that pain in her neck and shoulder were better, although they were both still stiff.  Tr. 537.  She added that her numbness and tingling and pain into her left arm and hand were about sixty percent better.  *Id.* She also told the physical therapist that she had "floated the river and went fishing (3.5hrs) and her shoulders and upper back were really sore."  *Id.*  The record also shows that in 2012, she reported to the emergency department for chest pain and said that her symptoms had begun while rafting three weeks earlier.  Tr. 393 (Sept. 7, 2012 chart note).  The ALJ explained that rafting was an activity that "by necessity requires sitting," and that a raft and fishing trip of three and one-half hours contradicted Plaintiff's assertion that she can sit for only ten minutes.  Tr. 24; *see also id.* Tr. 26 (citing 2014 rafting excursion as an activity undermining Plaintiff's allegations related to the intensity, persistence, and limiting effects of her physical symptoms); Tr. 27 (citing 2012 and 2014 rafting as activities that undermine Plaintiff's assertions).

        I agree with Defendant that the ALJ's conclusion was reasonable.  As *Molina* instructs, activities which may not be directly transferable to a work setting may still be used to discredit the claimant's testimony.  Plaintiff alleged she could sit no longer than ten minutes.  Tr. 51-52 (hearing testimony that in 2014, she could sit no longer than ten minutes).  The ALJ properly reasoned that a three and one-half hour rafting trip required more than ten minutes of sitting.  As

a result, it was reasonable to conclude that this 2014 activity was inconsistent with her asserted disabling limitation of sitting which she stated existed in 2014. Plaintiff notes that she had undergone lumbar spine surgery the previous December. Pl.'s Op. Brief 17 (citing Tr. 415). She also notes that in May 2014 she was advised to undergo cervical spine surgery, which she had in July 2014. *Id.* (citing Tr. 390, 407). She argues that the one-time rafting excursion should be viewed in the context of her prior lumbar spine surgery and the recommendation for cervical spine surgery which, she contends, show the severity of her impairments. But, these procedures do not, by themselves, establish a limit on sitting. As the ALJ properly recognized, these procedures were the treatment for impairments which *could* cause Plaintiff's alleged symptoms. But they do not alone establish the *extent* of Plaintiff's symptoms. Instead, although Plaintiff alleged that she cannot sit for more than ten minutes as a result of her impairments which have required surgery, the rafting activity, which occurred more than once, contradicts that allegation.

As to the other activities of daily living, Plaintiff argues that the ability to engage in personal care, prepare simple meals, do yard work, mow the lawn, etc., do not demonstrate an ability to sustain a greater level of activity than she alleged. Pl.'s Op. Brief 19. She contends that the ALJ relied on treatment notes that fail to support her reasoning or document only "one-off" events that do not clearly conflict with Plaintiff's alleged limitations. *Id.* As examples, she cites to treatment notes in which Plaintiff reported walking up hill or climbing stairs, shopping at a store with a friend, grabbing a shovel, lifting, walking for exercise, using scissors to cut her cat's fur, and mowing the lawn. *Id.* at 19-20 (citing Tr. 326, 379, 383, 488491, 520, 525).

The ALJ properly assessed that Plaintiff's engaging in these activities contradict her allegations that she naps and lays in bed several hours per day and can walk no more than ten feet

before needing to rest.  Tr. 226, 230.  In 2008, after her alleged onset date, Plaintiff reported a twenty-year history of hip pain, "especially with exercise, exacerbated by walking up hill or climbing stairs."  Tr. 316.  The chart note indicates that such exercise, with hill walking or stair climbing, was an ongoing activity, not a "one-off" event as Plaintiff suggests.  *See also* Tr. 491 (noting in 2013 that Plaintiff can walk for exercise, again suggesting this is an ongoing activity).  In 2012, she was injured while grabbing a shovel and in 2013, she reported an increase in back pain because she had been "lifting."  Tr. 383, 488.  In 2014, she reported an increase in neck pain after mowing the lawn.  Tr. 525.  Even if these were one-time occurrences, the ALJ reasonably concluded that they suggest that Plaintiff is more physically active than she alleges.

In sum, as to her activities of daily living, the ALJ's findings were a reasonable interpretation of the record which reveals several instances where Plaintiff engaged in an activity inconsistent with the disabling level of her allegations.

B.  Cessation of Work in 2007

In her Disability Report, Plaintiff stated that she stopped working because of her conditions and because her husband received a terminal diagnosis.  Tr. 211.  The ALJ concluded that the record showed that she ceased working due to her husband's medical condition and not because of her own impairments.  Tr. 25.  The ALJ relied on Plaintiff's later statements to her medical providers that she stopped working due to her husband's condition with no mention of her own impairments causing her to stop working.  *Id.*  She explained that she gave greater weight to those comments which were made in the pursuit of medical treatment rather than to the statements made in pursuit of disability benefits because Plaintiff had "every incentive to give her medical provider a complete and accurate depiction of her medical history, including her

symptoms and any resulting limitation that affected her ability to work." Tr. 25.  The ALJ also

noted the absence of medical records close to Plaintiff's January 31, 2007 alleged onset date.  *Id.*

Furthermore, the ALJ explained, records from the fall of 2008, which are the records closest in

time to the alleged onset date, showed that Plaintiff reported a long history of chronic pain in her

hips and low back, conflicting with an alleged onset date the prior year.  *Id.* (citing *e.g.*, Tr. 316

(reporting twenty years of bilateral hip pain)).

Plaintiff suggests that the ALJ's discussion regarding her alleged onset date shows that the

ALJ relied on gaps in treatment to support her determination that Plaintiff stopped working in

January 2007 for reasons other than her disability.  Plaintiff argues that if the ALJ questioned the

onset date because of gaps in treatment, the proper course is to take medical expert testimony not

to reject Plaintiff's testimony on that basis.  My reading of the ALJ's decision is different than

Plaintiff's.  The ALJ first noted Plaintiff's conflicting Disability Report allegations in that she

stopped working in January 2007 because of her own disabling condition and because of her

husband's terminal diagnosis.  Then, the ALJ cited to subsequent medical records in which

Plaintiff never stated that her own impairments caused her to stop working.  Instead, in those

medical records, Plaintiff reported that her husband's condition was responsible for her ceasing

work in January 2007.  With this, the ALJ determined that Plaintiff did not stop working in

January 2007 because of her own impairments.  As additional evidence in support of this

determination, she noted that there were no medical records contemporaneous with Plaintiff's

alleged onset date as would be expected if her impairments were the cause of her stopping work

at that time.  The ALJ did not, in my reading of her discussion, determine that "gaps" in

treatment prevented her from ascertaining the correct onset date.  Instead, the lack of

contemporaneous medical records supported the determination that contrary to Plaintiff's assertion, Plaintiff stopped working because of her husband's condition, not her own. Leaving work for a reason unrelated to the claimant's disabling symptoms is an appropriate basis to reject a claimant's subjective symptom testimony. *E.g.*, *Bruton v. Massanari*, 268 F.3d 824, 828 (9th Cir. 2001) (upholding credibility finding where the claimant stated at the hearing and to at least one doctor that he left his job because he was laid off, not because he was injured). The ALJ did not err.

C. Minimal Treatment/Controlled with Medication

The ALJ noted that Plaintiff reported a long history of chronic pain, primarily in her hips and back. Tr. 25 (citing records from 2008 and 2009). But, the ALJ found, she sought minimal treatment for those symptoms before August 2013. *Id.* The ALJ also noted that Plaintiff generally treated her symptoms and conditions with over-the-counter medication and muscle relaxers. Tr. 27 (citing Tr. 499 (Dec. 2013 chart note stating Plaintiff takes muscle relaxer and Advil for her back pain); Tr. 558 (May 2014 chart note stating for her back pain, Plaintiff muscle relaxers only); Tr. 560 (Sept. 2014 chart note stating she takes Tylenol and muscle relaxer for back pain and since her July 2014 neck surgery, one or two five-milligram doses of oxycodone per day which her physician recommended weaning off of in the long run)); *see also* Tr. 300 (Dec. 2009 chart note stating that Plaintiff took a "chronic low dose" of Vicodin for her musculoskeletal pains, particularly her shoulders, upper back, and lateral hips). Further, medications were fairly effective in controlling her symptoms. Tr. 26 (citing Tr. 491); Tr. 27 (citing Tr. 499, 558-60).

Plaintiff argues that the ALJ's finding is not supported in the record because she

underwent lumbar spine surgery during the period at issue and then had cervical spine surgery shortly after the end of the prescribed period.  This shows that she did not receive primarily minimal or conservative treatment and that medications were ineffective in controlling her pain.  Plaintiff does not suggest that the ALJ erred in reciting the evidence in the record.  Instead, she argues that her subsequent December 2013 lumbar spine surgery and July 2014 cervical spine surgery show that she received more than minimal treatment.  The problem with Plaintiff's argument is that her alleged onset date is January 2007, almost seven years before her December 2013 lumbar surgery.  There is no dispute that surgical intervention is more than conservative or minimal treatment.  But, the ALJ here was correct, and Plaintiff does not challenge, that before August 2013, she received primarily minimal treatment and primarily used over-the-counter medication and muscle relaxers to treat her symptoms.  Because the ALJ's interpretation of the record was reasonable, the ALJ did not err in concluding that a long history of fairly minimal treatment and medication use contradicted Plaintiff's symptom testimony that she suffered from disabling-level symptoms for the entire period at issue.

Plaintiff also argues that there is evidence that her treatment was impacted by financial and insurance barriers.  The record makes express reference to her financial status only in relation to medication and glasses for an eye impairment.  Tr. 349 (May 2013 eye appointment noting that in regard to monocular diplopia conditions, she was not using artificial tears as requested by Dr. Hills because (1) she did not want to add "anymore medications to system" and (2) they were too expensive); Tr. 491 (noting that she could not afford suggested prism glasses).  The record does not specifically mention an inability to pay for other types of treatment.  Additionally, there are references in the record to Plaintiff having insurance.  Tr. 501, 504, 559.

Plaintiff cites to an October 2008 chart note from "Volunteers in Medicine Clinic" in Eugene as evidence that her access to treatment was impaired by her finances. But, in the context of the overall record, and without any specific mention of financial constraints other than eye medication, that Plaintiff sought treatment at a low-income clinic is not enough to support Plaintiff's implied contention that her seven-year history of conservative treatment for her impairments was because she could not afford to pay for more.

D. Medical Evidence

The ALJ found that the medical evidence of record did not contain objective findings that would reasonably support the degree of limitation Plaintiff alleged. Tr. 27. The ALJ first noted that Plaintiff's allegation that hand cramps and accompanying vomiting and diarrhea prevented her from working was not supported by the medical evidence of record during the period at issue. Tr. 24. She found no mention of hand numbness or associated gastrointestinal symptoms before April 2013, more than six years after Plaintiff's alleged onset date. *Id.* Further, the ALJ found no objective findings suggesting a hand impairment and Plaintiff explicitly denied any symptoms of vomiting and diarrhea during the period at issue. *Id.*

The ALJ later noted that before August 2013, the objective and diagnostic findings were generally within normal limits. Tr. 25. For example, in 2011, a lumbar spine MRI showed just a "slight abnormality with no significant spinal stenosis or foraminal stenosis[.]" Tr. 596; *see also* Tr. 597 (2011 cervical spine MRI showed slight disc bulging at C2-3 with no significant spinal stenosis); Tr. 611-16 (March 2012 nerve conduction study showing no evidence of neuropathy, radiculopathy, or myopathy in right upper or lower extremities).

Additionally, the ALJ found that even after August 2013, Plaintiff reported good arm

strength in January 2014 and full overhead range of motion.  Tr. 26 (citing Tr. 512-13).  Then, treatment records from physical therapy Plaintiff received in 2014 for her cervical and lumbar spine conditions showed minimal arm pain and improved shoulder and cervical range of motion. Tr. 26 (citing Tr. 535-37).  The ALJ noted also that those same records did show ongoing back and leg pain.  *Id.*

Plaintiff argues that contrary to the ALJ's finding regarding the lack of evidence regarding her hand numbness, the record shows that she reported finger and wrist pain as early as the fall of 2008.  Pl.'s Op. Br. 16 (citing Tr. 316).  And, in 2009, she showed tenderness to her lateral epicondyles with forced extension of the wrist producing pain.  *Id.* (citing Tr. 308).  She also notes that in 2012, her muscle spasms impacted her hands and she experienced decreased strength, numbness, and tingling.  *Id.* at 16-17 (citing Tr. 607).  Finally, she cites to three places in the record which note bouts of diarrhea and bloating.  *Id.* at 17 (citing Tr. 589, 443, 607).

The records cited by Plaintiff do not establish that the ALJ erred.  First, a report of finger and wrist pain in 2008 is not a report of hand numbness.  Second, this report was Plaintiff's *subjective* report of pain and this particular finding by the ALJ is that the record was devoid of *objective* findings.  Tr. 316.  Third, the 2009 record is of elbow pain, not hand numbness. Fourth, the 2012 record notes her subjective complaints of muscle spasms affecting her entire body.  Tr. 607.  The mention of tingling is in regard to her foot.  Numbness was reported "all over."  *Id.*  Strength was decreased.  *Id.*  The only mention of Plaintiff's hand was that its posture could be altered "if" that area was involved.  *Id.*  The record contains no express mention of hand cramping being an ongoing problem rather than just being episodically affected by nonspecific cramping.  Additionally, all of these symptoms were Plaintiff's subjective reports.  Thus, the ALJ

did not err by determining that the medical record lacked objective findings to support Plaintiff's allegation that hand numbness prevented her from working. Additionally, Plaintiff does not challenge the ALJ's citation to the other parts of the record indicating relatively normal diagnostic findings in 2011 and 2012, as well as some normal strength and range of motion findings after August 2013. While there are isolated references in the record to Plaintiff experiencing diarrhea, there are again no objective findings regarding the diarrhea and alleged vomiting episodes. Accordingly, the ALJ did not err in determining that the objective medical record failed to support the degree of limitation Plaintiff alleged she suffered since her alleged onset date.

The ALJ's reasons in support of her credibility determination were clear and convincing and supported by substantial evidence in the record. There was no error.

## II. Treating Physician Opinion

Social security law recognizes three types of physicians: (1) treating, (2) examining, and (3) nonexamining. *Garrison v. Colvin*, 759 F.3d 995, 1012 (9th Cir. 2014). Generally, more weight is given to the opinion of a treating physician than to the opinion of those who do not actually treat the claimant. *Id.*; 20 C.F.R. §§ 404.1527(c)(1)-(2). "'To reject [the] uncontradicted opinion of a treating or examining doctor, an ALJ must state clear and convincing reasons that are supported by substantial evidence.'" *Ryan v. Comm'r*, 528 F.3d 1194, 1198 (9th Cir. 2008) (quoting *Bayliss v. Barnhart*, 427 F.3d 1211, 1216 (9th Cir. 2005)) (brackets in *Ryan*). "'If a treating or examining doctor's opinion is contradicted by another doctor's opinion, an ALJ may only reject it by providing specific and legitimate reasons that are supported by substantial evidence.'" *Garrison*, 759 F.3d at 1012 (quoting *Ryan*, 528 F.3d at 1198).

In January 2017, Plaintiff's treating primary care provider Dr. Stephan Schepergerdes, M.D., completed a medical evaluation form in which he noted her diagnoses, symptoms, and functional limitations. Tr. 965-69. In his opinion, Plaintiff would need to lie down frequently for hours during the day to take advantage of ice and heat treatments and was limited to ten minutes of sitting and standing/walking at one time, with a total amount of one to two hours of sitting and one hour of standing/walking in an eight-hour day. Tr. 966-97. She also would need a job permitting shifting positions at will from sitting, standing, or walking as well as allowing eight to ten unscheduled breaks of fifteen minutes each in an eight-hour day. Tr. 97-68. He assessed that she could never left twenty pounds or more, but could occasionally lift ten pounds or less. Tr. 968. He also opined that due to hand cramping, provoked even by typing, she could bilaterally grasp, turn, and twist objects only five percent of an eight-hour day and could use her fingers for fine manipulation only ten percent of an eight-hour day. *Id.* She was further limited to bilateral reaching to less than five percent of an eight-hour day. *Id.* She would also need fifteen-minute breaks to rest her hands after using them for handling or fingering. *Id.* Finally, he opined that she would miss more than four days of work per month because of her medical problems. Tr. 969.

The ALJ summarized Dr. Schepergerdes's opinion and gave it limited weight. Tr. 27. In support, the ALJ first noted that the opinion was issued seven years after Plaintiff's date last insured and almost three years after her prescribed period end date for DWB. *Id.* Next, the ALJ noted that although Dr. Schepergerdes had a longstanding treating relationship with Plaintiff and mentioned that her symptoms worsened in April 2007 after her husband died, he failed to distinguish between her current level of functioning and her functioning before her date last

insured (December 31, 2010), or the end of her prescribed period (April 30, 2014). Tr. 28.

Third, the ALJ found that Dr. Schepergerdes's limitations were not consistent with the record as a whole including the medical evidence of record and Plaintiff's activities of daily living. *Id.* The ALJ cited in particular what she characterized as "excessive limitations" on lifting, carrying, sitting, standing, walking, changing positions, unscheduled breaks, lying down, or absenteeism. *Id.* Further, the ALJ noted that there was no objective evidence during the period at issue to support the excessive manipulative limitations and no mention of hand cramps during the period at issue. *Id.* Finally, the ALJ noted Plaintiff's mowing the lawn, rafting, lifting items, shopping, walking, preparing meals, driving, and performing household chores as being inconsistent with Dr. Schepergerdes's opinions.

Plaintiff argues that under either the "clear and convincing" or "specific and legitimate," standard, the ALJ erred by giving Dr. Schepergerdes's opinion limited weight. First, she notes that the form asked whether the identified limitations had been present since the physician began treating the patient. Tr. 969. Although Dr. Schepergerdes neglected to check either the "yes" or "no," box, in the space allocated for a narrative response, he wrote: "Yes = longterm use tranquilizers antidepressants all symptoms worse since 4/2007 (husband's death) [illegible] first of 3 lumbar surgeries was Dec. 2013 neck surgery July 2014 [illegible] and septic arthritis during 2016." Tr. 969. Plaintiff argues that this response shows that Dr. Schepergerdes affirmatively opined that his limitations applied to the entire period at issue beginning in January 2007. She further notes that in a September 2014 office visit, Plaintiff told Dr. Schepergerdes that she was going to apply for disability benefits and that he indicated that "[b]y her history she would not be gainfully employable." Tr. 563. According to Plaintiff, this chart note confirms that Dr.

Schepergerdes believed Plaintiff's limitations were longstanding and existed well within the relevant period.

Second, Plaintiff argues that the medical record supports that she had "persistent, progressive symptoms that required several surgeries, the first of which was performed during the relevant period." Pl.'s Op. Br. 9. She points to chart notes showing her complaint of longstanding hip and low back pain in 2008 for which she received a diagnosis of left trochanteric bursitis and low back discomfort and was prescribed Naprosyn. Tr. 314. Her pain persisted into 2009 and she continued on Naprosyn. Tr. 308. Late in 2009, she received additional medications of Vicodin and Xanax. Tr. 300. Her report of muscle spasms appears in December 2010. Tr. 586. She was prescribed Baclofen, a muscle relaxant. Tr. 587. Plaintiff continues to recite and summarize her medical history, chronicling her muscle spasm complaints and treatment over the years. Pl.'s Op. Br. 9-10. She also recounts the medical evidence related to her diabetes, eye symptoms, and spine surgeries. Tr. 11-14. She makes no specific argument about any of these records, however. Instead, after stating that the records show she had progressive symptoms culminating in several surgeries, she offers these pages of summaries with no contention as to why they are inconsistent with the ALJ's opinion.

Third, she contends that for the reasons the ALJ erred by relying on her daily activities to undermine her subjective limitations testimony, the ALJ erred by relying on those activities to reject Dr. Schepergerdes's opinion. In summarizing, she argues that the ALJ erred in her treatment of Dr. Schepergerdes's opinion, that the opinion should be fully credited as true, and that based on that opinion, she should be found disabled.

I disagree. First, the specific and legitimate standard applies because Dr. Schepergerdes's

opinion is contradicted by opinions from non-examining physicians. *See Widmark v. Barnhart*, 454 F.3d 1063, 1066 & n.2 (9th Cir. 2006) (holding that ALJ had to provide specific, legitimate reasons supported by substantial evidence in the record to reject the treating physician's opinion which was contradicted by the opinion of a non-examining disability determination services physician; further noting that although the opinion of a non-examining physician "alone cannot constitute substantial evidence for rejecting" a treating physician's opinion, the non-examining physician's opinion can "suffice to establish a conflict among the medical opinions").

Second, for the reasons explained above in regard to Plaintiff's subjective symptom testimony, Plaintiff's daily activities were reasonably considered by the ALJ to be inconsistent with the limitations assessed by Dr. Schepergerdes.

Third, Dr. Schepergerdes's answer to the question of whether Plaintiff's limitations have been present since he began treating her is ambiguous. As noted above, he failed to check either the "yes" or "no" box in response to the question. Tr. 969. After the opportunity to check one of those two boxes, the question continues: "*If not*, please identify when the limitations started." *Id.* (emphasis added). He wrote "yes," and then offered more information that was not actually requested. Specifically, he noted the following: (1) long term use of tranquilizers and antidepressants; (2) all symptoms had worsened since Plaintiff's husband's death in 2007; (3) Plaintiff underwent lumbar surgery in December 2013; (4) Plaintiff had neck surgery in July 2014; and (5) she had deficits attributable to arthritis in 2016. Tr. 969. I agree with Defendant that these notations are not actually responsive to the question. I further agree with Defendant that they do not establish that the limitations assessed by Dr. Schepergerdes were retrospective to the date last insured or the prescribed period end date. No specific limitations are noted and the

only dates provided are either in connection with her spine surgeries or a vague assertion that "all symptoms" worsened in April 2007.  With a vague, ambiguous assertion about how long Plaintiff's limitations had existed, the ALJ properly determined that Dr. Schepergerdes did not clearly distinguish between her current level of functioning and her functioning during either of the relevant disability periods.[2]  He further appropriately observed that the report, completed in 2017, was three or ten years after the two relevant disability periods.  With that, the relevance of the opinion is greatly diminished as the ALJ suggested.

Finally, while Plaintiff spends substantial time recounting the medical evidence, for the reasons previously noted in connection with the credibility discussion, the ALJ's determination that the medical record does not support the severity of the alleged symptoms before mid-2013, was reasonable.  Given that the August - December 2013 time frame is almost three years after the date last insured and less than a year before the end of the prescribed period for DWB, the ALJ did not err in finding that the medical evidence did not support Dr. Schepergerdes's limitations.

Accordingly, the ALJ gave several specific and legitimate reasons in support of her assigning limited weight to Dr. Schepergerdes's opinion.

///

---

[2]  In her Reply Memorandum, Plaintiff argues that examining Dr. Schepergerdes's answer to the question of whether the identified limitations had been present since his treatment of her began, is improper post hoc rationalization.  Pl.'s Reply Br. 6, ECF 12.  But, Plaintiff herself relied on the narrative answer to that question to contend that Dr. Schepergerdes had asnwered the question affirmatively.  More importantly, the ALJ did reason that Dr. Schepegerdes had not carefully distinguished the limitations during the relevant periods of time.  Because this part of the report addresses that issue, it is not improper post hoc rationalization to consider the answer to this question.  This Court is in fact reviewing the very reasons given by the ALJ.

CONCLUSION

The Commissioner's denial of Plaintiff's DIB and DWB applications is affirmed.

IT IS SO ORDERED.

Dated this ___3___ day of _____July_____, 2019

_____
Marco A. Hernandez
United States District Judge